## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**T.M.**,                                        Case No. 2:23-cv-10852

Plaintiff,                                    Hon.

v.

**DETROIT PUBLIC SCHOOLS
COMMUNITY DISTRICT**,

Defendant.

_____

Elizabeth K. Abdnour P78203
Jacquelyn N. Babinski P83575
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 709-7700
elizabeth@abdnour.com
jacquelyn.babinski@abdnour.com

*Attorneys for Plaintiff*

_____

## COMPLAINT AND JURY DEMAND

Plaintiff T.M., by and through her attorney, ELIZABETH ABDNOUR, hereby brings this civil action against Defendant Detroit Public Schools Community District ("the District") appealing the final administrative decision dismissing Plaintiff's state due process complaint under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* T.M. also alleges the District violated her right under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), M.C.L. 37.1101 *et seq.* This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.

## **INTRODUCTION**

1.  T.M.,[1] now eighteen years old, began receiving special education services in the District in preschool.

2.  Despite T.M.'s diagnoses of Sickle Cell Anemia and Attention-Deficit/Hyperactivity Disorder ("ADHD"), her lack of academic progress year after year, as well as her mother, S.C.'s, persistent, vocal concerns about the inadequacy of T.M.'s accommodations and services, the District failed to comprehensively evaluate T.M. to assess her educational needs.

3.  Without baseline data on T.M.'s academic and cognitive abilities or periodic reevaluations, T.M.'s Individualized Education Plan ("IEP") consisted of inappropriate, unattainable goals and inadequate services and accommodations.

---

[1] T.M. are the student's initials.

4. S.C. repeatedly asked the District for more frequent reporting on her daughter's progress and more data and tests to assess the appropriateness of T.M.'s IEP.

5. The District either ignored or rejected S.C.'s requests.

6. T.M. has now graduated high school with elementary or middle school level reading, writing, and math skills.

7. Accordingly, T.M. alleges that the District denied her a Free and Appropriate Public Education ("FAPE") by failing to evaluate her, failing to draft an IEP reasonably calculated to meet her educational needs, failing to revise her IEP to enable her to make progress, and by failing to implement her IEP as written.

8. T.M. has an interest in doing hair and nails.

9. She hopes to study business and cosmetology and to one day open her own salon.  (Tr. 204).

10. However, due to the District's denial of a FAPE, T.M. lacks the foundational skills needed to be a productive member of society and to succeed in her post-graduation plans.

11. Thus, she now seeks reversal of the ALJ's decision and compensatory education services to help her advance as far as possible towards the level of a high school graduate in reading, writing, and math and to provide her behavioral and mental supports to address her underlying social-emotional needs.

**JURISDICTION AND VENUE**

12. This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 626 and 28 U.S.C. § 1331.

13. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

14. The Court also has jurisdiction over Plaintiff's IDEA claims under 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which confer jurisdiction without regard to the amount in controversy.

15. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

16. Plaintiff has exhausted all administrative remedies pursuant to 20 U.S.C. § 1415(l).[2]

---

[2] On April 13, 2021, S.C., on behalf of T.M., filed a Due Process Complaint with the Michigan Department of Education against the District alleging violations of the IDEA, ADA, Section 504, and the PDCRA.  In an order dated April 30, 2021, the ALJ dismissed all claims brought under

17. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Eastern District of Michigan as the Defendant School District is located and operates in the Eastern District of Michigan and the events and omissions giving rise to this action occurred within the Eastern District.

## **PARTIES**

18. Plaintiff T.M. is an eighteen-year-old individual who, at all relevant times, resided within the Detroit Public Schools Community District in Wayne County, Michigan. T.M. has been diagnosed with Sickle Cell Anemia, ADHD, developmental delays, and speech and language delays. T.M. is eligible for special education and related services under the IDEA. T.M. is also an individual with a disability within the meaning of Title II of the ADA, Section 504, and PDCRA as she has a physical and mental impairment that substantially limits one or more major life activities including processing information, concentrating, and learning.

19. Defendant Detroit Public Schools Community District is a local education agency subject to the provisions of the IDEA. The District was responsible for providing T.M. a FAPE under the IDEA. 20 U.S.C. §§ 1400-1419. The District is a recipient of federal financial assistance, subject to the requirements of Section 504, 34 C.F.R. § 104.31 *et seq.*, and a public governmental entity subject to the provisions

---

the ADA, Section 504, and the PDCRA for lack of jurisdiction. A hearing was held on April 7, 8, 14, and 23, 2022, and the ALJ issued a decision and order dismissing Plaintiff's complaint on January 13, 2023.

of the ADA, 42 U.S.C. § 12131, *et seq*.   The District is a place of public accommodation subject to the provisions of PDCRA, M.C.L. 37.1101 *et seq*.

## **LEGAL FRAMEWORK**

20. The IDEA requires that qualifying children with disabilities receive a free and appropriate public education ("FAPE").   20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a).

21. To achieve this goal, the IDEA and its implementing regulations require that school districts design and develop an individualized education program ("IEP") for each qualifying child.   20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-24.

22. In *Endrew F. v. Douglas County School District Re-1*, 137 S. Ct. 988, 999 (2017), the Supreme Court defined FAPE as an offer of education, "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."   The Court further clarified that, in designing an IEP, "every child should have the chance to meet challenging objectives," and the IEP Team must give, "careful consideration to the child's present levels of achievement, disability, and potential for growth."   *Id.* at 999, 1000.

23. Pursuant to the IDEA's Reevaluation mandate, a school district must ensure that "a reevaluation of each child with a disability is conducted . . . if the local educational agency determines that the educational or related service needs,

6

including improved academic achievement and functional performance, of the child warrant a reevaluation." 20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. § 300.303(a)(1).

24. In conducting an evaluation, the IDEA and its implementing regulations require school districts to, "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . the content of a child's [IEP], including information related to enabling the child to be involved in and progress in the general education curriculum." 20 U.S.C. § 1412(b)(2)(A)(ii); 34 C.F.R. § 300.303(b)(2).

25. The IDEA and its implementing regulations also require school districts to "ensure that the IEP Team . . . revises the IEP as appropriate to address any lack of expected progress toward the annual goals and in the general education curriculum . . . ; the results of any reevaluation conducted . . . ; the child's anticipated needs; or other matters." 20 U.S.C. § 1414(d)(4)(A)(ii); 34 C.F.R. § 300.324(b)(1)(ii).

26. While the IDEA guarantees individually tailored educational services, the ADA and Section 504 mandate non-discriminatory access to federally funded programs. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017).

27. Public schools that receive federal funds must comply with all three statutes, and the same underlying conduct—including denial of a FAPE—can violate the IDEA, the ADA, and Section 504 all at once. *Id.* at 755-56.

28. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

29. Further, under the Title II of the ADA, covered entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130(b)(7).

30. Similarly, Section 504 of the Rehabilitation Act and its implementing regulations provide that no one may be excluded from a program receiving federal funds "solely by reason" of her disability. 29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a).

31. Under Section 504, a school district must provide a FAPE, meaning "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of [a child with a disability] as adequately as the needs of [non-disabled students] are met and (iii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R. §§] 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(a)-(b).

32. Michigan's Persons with Disabilities Civil Rights Act ("PDCRA") also guarantees full and equal use of public accommodations, public services, and

educational facilities free from discrimination because of a disability.   M.C.L. 37.1102.

33. The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deprive any person of life, liberty, or property, without due process of law" nor "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

34. The PDCRA prohibits public educational institutions from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability . . . ." M.C.L. 37.1402(a).

## FACTS

35. T.M. is diagnosed with Sickle Cell Anemia, Attention-Deficit/Hyperactivity Disorder ("ADHD"), developmental delays, and speech and language delays.

36. T.M. is hospitalized as often as three to four times a year for three to fifteen days at a time due to her Sickle Cell Anemia.

37. The District initially evaluated T.M. for special education services in 2008 when she was three years old and found her to be eligible for special education and related services as a student with an "other health impairment" ("OHI") due to her Sickle Cell Anemia.

38. The District provided T.M. with special education services from preschool through her high-school graduation in June 2022.

39. During this time, T.M. remained eligible for special education and related services under the OHI category.

*2018-2019 School Year – Ninth Grade*

40. On February 13, 2019, an IEP meeting was held for T.M.

41. At that time, S.C. expressed her concerns about T.M.'s grades and requested that the District keep her apprised of T.M.'s academic performance so that she could be made aware of T.M.'s struggles before seeing a bad grade on her report card.

42. S.C. also requested more parent-teacher dialogue to ensure T.M. was receiving the resource support set forth in her IEP.

43. Included in the February 13, 2019, IEP were T.M.'s results from the Brigance Inventory of Basic Skills ("Brigance") Evaluation administered on February 7, 2019.

44. The results indicated that T.M. was performing significantly below the ninth-grade level, with word recognition at a seventh-grade level and math skills at a second-grade level.

45. An Achieve 3000 evaluation revealed that T.M. had a second or third grade lexile level.

46. Despite these alarming results, the District provided T.M. minimal support.

47. T.M.'s IEP gave her permission to complete assignments in a resource room and provided an unspecified amount of extended time to complete assignments.

48. The IEP also stated that T.M.'s teachers would modify all assignments, yet failed to include any details regarding how they would do so.

49. The only modification specifically related to improving T.M.'s second-grade math skills was use of a calculator on tests.

50. In terms of direct consultation, the IEP provided T.M. speech and language services for only thirty minutes, twice a month (1 hour per month) and social work services for thirty minutes, three times per month (1.5 hours per month).

51. This was despite documented concerns regarding T.M.'s ability to comprehend spoken language as well as her socio-emotional or behavior skills.

52. The IEP stated that T.M. would continue to need "resource support" but did not specify how often or for what duration she would receive this support, nor did the IEP specify in what way "resource support" would be provided.

53. Despite S.C.'s express request for more frequent reporting on T.M.'s progress so that she would be made aware of issues before seeing a bad grade on T.M.'s report card, the IEP only called for reporting to S.C. concurrent with the report card periods.

54. At the IEP meeting, S.C. asked the District for additional testing to assess T.M.'s needs, as T.M. had not been comprehensively evaluated since 2008 when she was three years old.

55. Despite S.C.'s request, no additional evaluations were done at this time.

56. Following the February IEP meeting, S.C. had an email exchange with Charlene Mallory (principal) and Nikolai Vitti (superintendent) regarding the District having changed some items on T.M.'s IEP without her consent or knowledge (including a change in the speech therapy frequency) and to express her continued concerns regarding the inadequacy of services provided by the District and T.M.'s continued lack of progress.

57. On or around March 27, 2019, S.C. filed a state complaint with the Michigan Department of Education ("MDE") against the District based on the lack of resource hours, lack of social work services, and lack of speech services.  The complaint also raised the District's failure to meet T.M.'s transportation needs.

58. On or around May 28, 2019, S.C. also filed a *pro se* due process complaint against the District for its failure to provide T.M. a FAPE for the 2017-2018 and 2018-2019 school years due to the lack of resource support and speech and social work services.

59. On or around June 9, 2019, the MDE issued findings in the state complaint.

60. MDE found that the District denied T.M. a FAPE, that the District failed to follow the procedures and processes required by the IDEA and MARSE, and that the District failed to review and revise T.M.'s IEP consistent with the regulations.

61. MDE ordered the District to revise T.M.'s IEP, including by providing written notice of the District's determination regarding T.M.'s transportation to and from school.

62. On or around July 3, 2019, the parties engaged in mediation and reached an agreement to resolve S.C.'s due process complaint.

63. The settlement included an award of $13,260 for compensatory education services to be provided upon receipt of an invoice and log of services.

### The District's Delay in Providing Compensatory Education

64. S.C. selected Ms. Taylor to provide compensatory education to T.M. pursuant to the parties' mediation agreement and submitted a letter from the instructor with dates and times of services.

65. More than two weeks later, on or around July 29, 2019, S.C. emailed Marlene Hunter-Armstrong, Director of Compliance, to follow up about approval and payment.

66. The District failed to timely approve the request.

67. On or around August 9, 2019, S.C. informed Ms. Hunter-Armstrong that Ms. Taylor withdrew her services because of her concern about timely payments from the District.

68. On or around August 9, 2019, S.C. selected Ms. Carey to instruct T.M.

69. Ms. Carey made several attempts to turn in her paperwork for approval and was eventually told that Tammora Green, Supervisor of Compliance, was out of the office until the end of August.

70. Shortly thereafter, Ms. Carey withdrew her services to accept a more secure position.

71. S.C. immediately submitted two additional candidates for approval, Ms. Devoe (occasionally referred to by maiden name Gaithers) and Mr. Ernst.

72. Desperate for T.M.'s compensatory education to begin after the District's month-long delay, S.C. asked Ms. Devoe and Mr. Ernst to begin instructing T.M. and paid them out of her own pocket.

73. T.M. again followed up with the District on September 10, 2019, this time through her counsel at the time, Jason Wine.

74. On or around September 12, 2019, Marquita Sylvia, counsel for the District, responded stating that S.C. would need to submit a *certified teacher* for approval.

75. This certification requirement was not included in the parties' mediation agreement.

76. S.C.'s counsel disputed this requirement in a follow-up email to Attorney Sylvia on October 29, 2019.

77. This issue remained in dispute, and on or around December 12, 2019, Ms. Green called S.C. and informed her that the District would provide something in

writing the following day regarding next steps.  S.C. never received anything in writing.

78. S.C. followed up with Ms. Green via email on or around January 12, 2020. At this point, more than six months had elapsed since compensatory services were set to begin.

79. In the meantime, S.C. received two Fs on her report card and continued to struggle at school.

80. The first two candidates S.C. submitted for approval were certified teachers; however, both withdrew due to the District's delays.

81. The subsequent two candidates, Ms. Devoe and Mr. Ernst, while not certified teachers, were a college professor with a Doctoral Degree and former Dean of Mathematics, respectively.

82. The dispute remained unresolved through the summer of 2020.

83. On or around July 7, 2020, Ms. Green emailed S.C. asking if S.C. was interested in summer virtual compensatory services from the compliance office.

84. S.C. responded the same day declining virtual learning because she had already chosen her providers and was awaiting approval.

85. As she explained, at this point, S.C. had lost confidence in the District and preferred to use providers of her choosing pursuant to terms of the mediation agreement.

86. In an email from Attorney Sylvia on or around August 21, 2020, the District reiterated its erroneous position that S.C. was required to submit only certified teachers for approval.

87. Given the District's persistent refusal to approve S.C.'s proffered candidates pursuant to the parties' mediation agreement, S.C. submitted a new provider, Darya Owens, on or around September 25, 2020.

88. On or around October 26, 2020, S.C. emailed Ms. Green to follow up, as over a month had passed and the District had not yet approved Ms. Owens.

89. Although the District had sent out a schedule for Ms. Owens' services, it had not approved Ms. Owens for payment.

90. Ms. Owens was (reasonably) unwilling to begin instructing T.M. without District approval.

91. At that point, Ms. Owens had already missed at least six sessions under the District's own schedule.

92. On or around December 2, 2020, *a year and a half* after the mediation agreement was signed, the District finally approved a provider, Ms. Owens, to begin instructing T.M. so she could receive the compensatory education the District had agreed she was owed.

93. By December of 2020, T.M. was well into her junior year of high school without having made progress towards achieving her math and language goals and obtaining the skills needed to succeed after graduating.

94. In addition to the District's detrimental delay, S.C. was ultimately pressured, against the terms of the mediation agreement, to select a less preferred and less credentialed instructor for her daughter's compensatory education.

95. Ms. Owens instructed T.M. after school from December 2020 through June 2021 for 20 hours per week.

96. T.M. had a difficult time with compensatory education in part because it occurred for four hours each day after a full seven-hour school day.

97. S.C. requested that the District provide compensatory education on the weekend to accommodate T.M.'s needs.  (Tr. 38).

98. Despite T.M.'s documented difficulty with concentration and fatigue, the District refused her request.  (Tr. 32-33, 38).

*2019-2020 School Year – Tenth Grade*

99. When S.C. met with school staff on or around December 18, 2019, T.M.'s language arts teacher told S.C. that she did not know T.M. had an IEP.

100.     On February 11, 2020, the District held a Review of Existing Evaluation Data ("REED") meeting for T.M.

101.    The REED form relied on T.M.'s results from a February 5, 2020, Brigance Evaluation, which had revealed that T.M. was performing two grade levels below in word recognition and maintained a second-grade level in math.  T.M. also performed at the seventh-grade level in reading comprehension.

102.    The REED form did not include T.M.'s grades.

103.    Under the parent input section, S.C. expressed her concern that the District was not providing adequate educational services or fully implementing T.M.'s IEP.

104.    The REED form contained no observations by teachers or service providers.

105.    Despite T.M.'s lack of progress including two failing grades and S.C.'s persistent concerns, the District concluded that no additional data was needed to determine T.M.'s educational needs.

106.    The District seemed interested only in assessing T.M.'s continued eligibility for special education services, which was never in doubt given T.M.'s diagnosis of Sickle Cell Anemia and eligibility as "Otherwise Health Impaired."

107.    On the same day, on or around February 11, 2020, the District also held an IEP meeting.

108.    The IEP form reiterated S.C.'s concern that the District was not providing T.M. an appropriate education.

109.    The IEP was based on the same February 5, 2020, Brigance Evaluation indicating below grade-level performance in all tested subjects.

110.    The Present Levels of Academic Achievement and Functional Performance ("PLAAFP") once again noted concerns in reading, math, communication, and socio-emotional/behavioral skills.

111.    Despite T.M.'s lack of progress in all subjects, the PLAAFP removed writing as an area of concern with no explanation.

112.    The District failed to include a writing goal in T.M.'s IEP despite S.C.'s express request that one be added.

113.    When S.C. asked for a writing goal to be included, the District erroneously told her there was a maximum of two subject areas with a cap of two goals per subject area.

114.    Since T.M.'s IEP included two subject areas (reading and math) with two goals apiece, the District told S.C. it could not add a writing goal.

115.    Despite T.M.'s lack of progress and the same listed academic and functional performance concerns, the District reduced the supplementary aids and services it provided T.M.  The IEP no longer permitted teachers to modify all her assignment and now specified that T.M. would receive only a one-day extension on assignments.

116.     The District continued to provide the same number of consultative services hours for social work (1.5 hours per month) notwithstanding continued, documented concerns regarding T.M.'s socio-emotional and behavior skills.

117.     The District added only one thirty-minute session per month for speech and language services (1.5 hours per month) despite T.M.'s lack of progress in this area and documented concerns.

118.     The IEP stated that T.M. would receive 300 minutes or five hours per week of special education "resource support" but did not specify what this entailed.

119.     The IEP once again stated that S.C. would be informed in writing of progress on goals and objectives only every grading period.

120.     In any case, the District never provided S.C. progress reports along with T.M.'s report card.

121.     At the IEP meeting, S.C. again asked the District to reevaluate T.M. to assess her needs.

122.     The District had not comprehensively evaluated T.M. since 2008.

123.     No additional evaluations were given at this time.

124.     The IEP included a provision regarding T.M.'s transportation to and from school, stating that "[T.M] will be picked up by a small vehicle with curb to curb services . . . ."

125.     However, T.M. continued to experience issues with transportation, often arriving late to school.  (Tr. 102-103).

126.     Several times, T.M. had to start the school year late because the District did not send someone to pick her up.  (Tr. 138).

127.     These issues continued through T.M.'s senior year.

128.     T.M. also began experiencing a delay of two to three days in resumption of transportation services after a hospital stay.  (Tr. 100-101).

129.     S.C. was not reimbursed for days she had to drive T.M. to school herself when no transportation arrived.  (Tr. 138).

### 2020-2021 School Year – Eleventh Grade

130.     On or around October 1, 2020, S.C. emailed the IEP Team requesting a meeting to increase progress reporting and amend T.M.'s distance-learning modifications during the COVID-19 pandemic.

131.     A meeting was held on or around October 12, 2020.

132.     However, despite the presence of a mediator, no agreement was reached regarding additional accommodations, and T.M.'s IEP remained unchanged.

133.     On October 13, 2020, S.C. emailed Ms. Green reiterating her request that a writing goal be added to T.M.'s IEP so that this subject area could be included in her compensatory education instruction.

134.     S.C. pointed out that the IEP did not include any new evaluations or other data supporting the District's position that T.M. did not have a deficit in writing.  Thus, S.C. requested that the District provide the underlying evaluations or data used to create T.M.'s IEP.

135.     Another IEP meeting was held on or around October 20, 2020, but the District failed to address S.C.'s concerns and T.M.'s IEP remained unchanged.

136.     At the IEP meetings on or around October 12, 2020, and October 20, 2020, S.C. repeated her request that the District reevaluate T.M. to assess her needs.

137.     T.M. had not been comprehensively evaluated since 2008.

138.     S.C. also repeated her request for any data the District relied on to formulate T.M.'s IEP.

139.     Because of the District's failure to provide the evaluations and data used to create T.M.'s IEP and the District's failure to amend the IEP to adequately support T.M., at this point, S.C. requested an independent educational evaluation ("IEE").

140.     In a letter dated October 16, 2020, the District denied S.C.'s request for an IEE.

141.     At the same time, the District agreed to conduct a further REED and an individualized evaluation "for any suspected areas of disability" "in an effort to resolve [the] matter without resorting to a due process hearing."

142.     On or around October 26, 2020, S.C. emailed Ms. Green to follow up on her request for the data supporting T.M.'s IEP.

143.     S.C. also pointed out that the service logs she received were incomplete and inaccurate, and that multiple speech and resource sessions were missing.

144.     In addition, the District failed to properly complete T.M.'s progress report forms.

145.     The "comments on progress" sections were often completely blank or included only minimal boilerplate language such as "progressing as expected."

146.     Resource Provider Genise Turner testified that she did not recall why she did not put any data in the comment sections of T.M.'s progress reports. (Tr. 492).

147.     Further, S.C. frequently contacted Ms. Turner either by phone or in person, but Ms. Turner did not discuss T.M.'s progress on goals with her. (Tr. 490). This occurred only at T.M.'s IEP meetings. (*Id.*).

148.     Special Education Teacher Gretchen Madison similarly testified that she did not know why she did not include data in the comment sections of T.M.'s progress reports and that she had never been trained to include whether the student is progressing towards the objective and at what criteria level. (Tr. 378-379).

149.     A REED meeting was held on or around October 30, 2020.

150.    The REED form included T.M.'s prior Brigance Evaluation results from February 5, 2020.

151.    The observations by teachers and providers section consisted of two sentences addressing in general terms T.M.'s fatigue and motivation level.  It did not contain any specific observations related to T.M.'s current performance levels.

152.    The REED form contained T.M.'s grades broken down by semester rather than quarter, so it did not include the two "Fs" T.M. received in the first quarter in language arts and economics.

153.    The District concluded that additional data was needed to determine T.M.'s "present level of academic achievement and developmental needs."

154.    Despite the lack of data contained in the REED, T.M.'s 2.0 GPA, S.C.'s persistent concerns, and the District's own acknowledgement that more data was needed, the District proposed conducting only an academic achievement test.

155.    The District had not comprehensively evaluated T.M. since 2008 and had never administered a cognitive evaluation.

156.    On or around November 13, 2020, Steven Portnoy, M.A. administered the Woodcock-Johnson IV Tests of Achievement Form A to T.M.

157.    The test indicated the following results:

    a.  Basic Reading Skills – 9.6 grade level

    b.  Reading Comprehension Skills – 6.8 grade level

     c.  Reading Fluency Skills – 5.4 grade level

     d.  Math Calculation Skills – 3.2 grade level

     e.  Math Reasoning Skills – 4.3 grade level

     f.  Written Expression Skills – 5.4 grade level

158.     Mr. Portnoy's Report recommended "Tier 2" supports in the subject areas of reading comprehension, reading fluency, written expression, and math.

159.     With respect to math, Mr. Portnoy recommended that the District specifically address both basic calculation and math reasoning skills in T.M.'s IEP and provide T.M. support from a special education resource teacher.

160.     In addition to extended time on tests and assignments, access to a smaller classroom for tests and quizzes, and use of a calculator, Mr. Portnoy noted that assignments and homework may need modifying.

161.     On or around December 2, 2020, an IEP meeting was held to review the results of the evaluation and revise T.M.'s IEP.

162.     Although the recent Woodcock-Johnson evaluation showed T.M. to be performing between three and four grade levels behind in Reading Comprehension and Reading fluency, the District removed reading as an "area of need."

163.     Further, despite T.M.'s alarmingly low results on the Woodcock-Johnson evaluation in math, the District did not provide any direct services for math.

164.     The number of direct/consultative services hours for speech and language and social work services remained at 1.5 hours per month.

165.     Like the February 11, 2020, IEP, the December 2, 2020, IEP failed to include as an accommodation that T.M.'s teachers would modify her assignments.

166.     The IEP provided a mere 300 minutes (five hours) total of special education "resource support" per week.

167.     The District also removed assistive technology from T.M.'s IEP without providing any explanation or justification for the removal.

168.     Although S.C. repeated her request for more frequent progress reporting, the IEP continued to only call for progress reporting concurrent with the regular grading periods.

169.     The District continued to fail to provide progress reports to S.C.

170.     Unsatisfied with the District's limited reevaluation of T.M. and continued failure to provide adequate support for T.M. in her IEP, S.C. reiterated her request for an independent evaluation at the December 2, 2020, IEP meeting.

171.     On or around December 8, 2020, the District granted S.C.'s request for an IEE, capping the cost for such at $1,500.

172.     Due to complications arising from the COVID-19 pandemic (closed agencies, backlogs, etc.) and inflation which had increased provider costs, S.C. was unable to find a provider within the District's budget.

173.     The District delayed approving S.C.'s request for an increase in funds.

174.     S.C. ultimately had to compel payment for the evaluation.

175.     Due to the District's delays, the IEE was not conducted until on or around September 1, 2021.

176.     On or around January 21, 2021, another IEP meeting was held.

177.     At this point—halfway through T.M.'s junior year of high school—the District finally increased T.M.'s resource support.

178.     T.M.'s resource support increased from 300 minutes per week to 600 minutes (ten hours) per week.

179.     The nature of this support was still undefined.

180.     Ms. Madison, who provided T.M.'s special education services, testified that there were not enough hours in the day for resource room time, and that T.M. would have to skip one of her regular general education courses to attend.  (Tr. 358-359).

181.     The District also added a reading fluency goal.

182.     However, the District did not add any additional services, programming, or accommodations, despite continuing to document T.M.'s significantly below-grade-level performance.

183.     The District continued to provide only 1.5 hours per month of direct/consultative services for speech and language and social work.

184.     T.M.'s math goals (both computational and reasoning) remained the same or were less ambitious than those listed in her December 2020 IEP indicating a complete lack of progress.

185.     The District aimed, once again, for T.M.—now in eleventh grade—to achieve a third or fourth grade level in basic math skills like addition and subtraction without providing any additional support.

186.     The January 21, 2021, IEP, like the prior December 2, 2020, IEP, did not provide any direct services to address T.M.'s stark deficits in math.

187.     The IEP also failed to include as an accommodation that T.M.'s teachers would modify her assignments.

***Independent Evaluation***

188.     On September 1, 2021, Dr. Jessica Garrett conducted a comprehensive psychological evaluation of T.M. as an IEE.

189.     As part of that evaluation, Dr. Garrett conducted a clinical interview of T.M. and S.C., reviewed T.M.'s results from the Woodcock-Johnson evaluation by Mr. Portnoy, reviewed T.M.'s current IEP, observed T.M.'s relevant performance behaviors, and administered the following assessments: Wechsler Adult Intelligence Scale – 4th Edition, Wechsler Individual Achievement Test – 3rd Edition, Child Behavior Checklist for Ages 6-18, and the Vineland Adaptive Behavior Scales – 3rd Edition.

190.    Dr. Garrett's evaluation found that T.M. had an extremely low IQ (2nd percentile) making it difficult to "keep[] up with her peers in a wide variety of situations that require thinking and reasoning abilities."

191.    Dr. Garrett also found that T.M. had an extremely low ability to process simple or routine visual material (processing speed).

192.    T.M.'s academic abilities were also found to be in the extremely low range.  T.M.'s reading level fell at the 2nd percentile and her math and writing levels fell at or below the 1st percentile.

193.    At the same time, T.M.'s adaptive skills (i.e., real life skills such as personal grooming, dressing, safety, ability to work, social skills, and personal responsibility) fell in an average range.

194.    Dr. Garrett noted that T.M.'s observed fatigue while testing "may have had a moderate effect on her capacity to fully express her true abilities."

195.    Nevertheless, she concluded that the results were valid and suggested using the upper end of confidence intervals when possible.

196.    Despite T.M.'s low cognitive and academic scores, because of her average adaptive skills, Dr. Garrett concluded that, "T.M. does not fit the profile of either a student with a Cognitive Impairment or a student with a Specific Learning Disability."

197.    Based on T.M.'s results, Dr. Garrett concluded that "intensive special educations services and support" were warranted.

***Administrative Due Process Complaint***

198.    On or around April 13, 2021, S.C. filed a due process complaint against the District with MDE.

199.    On April 7, 8, 14, and 23, 2022, a hearing was held before an Administrative Law Judge ("ALJ") to address whether the District denied T.M. a FAPE by:

1.  Failing to comprehensively evaluate T.M. to determine her educational needs;

2.  Failing to revise T.M.'s Individual Education Program (IEP) to address her alleged inability to access an educational benefit and make appropriate progress;

3.  Failing to draft an IEP reasonably calculated to meet T.M.'s educational needs and allow her to access an education benefit and make appropriate progress; and

4.  Failing to implement T.M.'s IEP as written.

200.    At the hearing, Dr. Garrett testified to the importance of performing comprehensive evaluations for students with IEPs, particularly cognitive assessments, to identify a student's current level of performance and its impact in the classroom.  (*See* Tr. 267-268, 275-276).

201.    According to Dr. Garrett, in her experience as a school psychologist, the District would have had access to cognitive evaluations.  (Tr. 275).  She was

surprised the District had never performed a cognitive evaluation on T.M., testifying that "even . . . with T.M.'s educational eligibility being otherwise health impaired, with what we know about sickle cell anemia, with what we know about ADHD . . . it would be really important to see where her cognitive levels fell at some point [in order to] have a baseline going forward to see if there was any sort of cognitive impairment or loss of cognitive skills based on [ ] her complex medical history." (Tr. 275).

202.    If presented with a student like T.M., diagnosed with sickle cell anemia and ADHD, Dr. Garrett testified that she would have initially conducted a cognitive assessment and full academic assessment to establish baselines.  (Tr. 275-276).  Dr. Garrett would also reevaluate "a student with this complex medical history" every three years to "see how her cognitive skills are . . . trending . . . [and] to continue to assess academics to see what's working [and] what's not."  (*Id.*).

203.    In addition to conducting further testing as part of an initial, comprehensive evaluation, Dr. Garrett testified that T.M.'s results on the 2020 Woodcock-Johnson evaluation should have prompted the District to conduct follow-up evaluations to determine "why her scores were so [far] below where we would expect them to be."  (Tr. 274-275).

204.    Dr. Garrett testified that given T.M.'s results, she would "understand[] much less of what was said in a general education classroom [and] what was

expected of her in a general education classroom" and that "we would expect that her performance would be much lower than those of her peers."  (Tr. 272).  In other words, she would have difficulty "sitting in a general education classroom . . . grasping grade level material."  (Tr. 267, 268).

205.     According to Dr. Garrett, with appropriate education services including intensive and individualized support, T.M. would be capable of learning and achieving higher scores than her reading, writing, and math evaluations indicated. (Tr. 269, 270-271, 287).

206.     For reading, Dr. Garrett opined that T.M. would need "maximum, intensive, research-based . . . reading support" such as the Orton-Gillingham program with built in measures to determine if she was making progress, emphasizing that "it would . . . be important that it [have] multiple checkpoints throughout to check her progress."  (Tr. 269-270).

207.     Dr. Garrett recommended interventions and accommodations including, "intensive interventions in as small a group as possible" with modified and shortened assignments, as T.M. would not be "expected to do grade level work when . . . her scores [were] as such."  (Tr. 272).  Dr. Garrett also recommended having "someone . . . sitting with her to . . . gauge what [T.M. is] grasping out of general education classes."  (Tr. 278).  Dr. Garrett further opined that T.M. would

need "frequent breaks" with "a plan so she knew how to utilize those breaks."  (Tr. 273, 279).

208.     Dr. Garrett also testified that T.M. would have benefited from assistive technology, like audio books and speech to text software.  (Tr. 286-287).

209.     When a student experiences an extended absence due to hospitalization like T.M., Dr. Garrett explained that, based on her experience as a school psychologist, a school district would typically provide special education services by sending a certified teacher to the hospital or child's home.  (Tr. 294-295).

210.     The District never considered this option for T.M. even though her Special Education Teacher, Ms. Madison, had concerns about the amount of school T.M. missed due to her hospitalizations and the fact that T.M.'s resource providers had discussed amongst themselves how such a program could have benefited T.M.  (Tr. 440-442).

211.     Dr. Garrett concluded that the District's current accommodations and services for T.M. were insufficient to allow her to make progress in the general education curriculum.  (Tr. 272, 273, 278, 279).

212.     In particular, Dr. Garrett stated that the duration (five hours per week) and type of resource support the District provided were inadequate.  In her opinion, T.M. would need someone "sitting with her every class throughout the school day to ensure that she's understanding [the material]."  (Tr. 278-279, 285).

213.     Moreover, Dr. Garrett testified that T.M.'s current reading, writing, and math goals were not appropriate for T.M. based on her current performance levels, and that the goals expected significantly more than T.M. was capable of performing given their focus on grade level criteria and T.M.'s significantly lower performance. (Tr. 279-280, 282, 285).

214.     Dr. Garrett did not believe that the frequency and duration of services provided would have allowed T.M. to meet the stated goals.  (Tr. 285-286).

215.     For example, Dr. Garrett was perplexed by how the District expected T.M. to advance from a third grade to a fourth or fifth grade level in math by attending a high school math class without more support.  (Tr. 280).

216.     Similarly, Dr. Garrett felt it would be "impossible" for T.M. to achieve her speech and language goals with "just three . . . 30 minute sessions a month." (Tr. 285-286).

217.     Mr. Portnoy, who conducted T.M.'s 2020 Woodcock-Johnson evaluation, testified that without additional testing "it's hard to say what's causing [T.M.'s] scores," further stating that "the fact that [the District] asked for only achievement testing . . . leaves me at a little bit of a loss to say why any of this would be one way or another."  (Tr. 457).

218.    However, Mr. Portnoy testified that he did not request additional testing because "The REED [ ] made pretty clear that [the District] did not feel that she was going to be changing her eligibility."  (Tr. 458).

219.    Thus, Mr. Portnoy's testimony confirms that his only aim was assessing T.M.'s eligibility for special education services—which was never in doubt—rather than assessing her individual educational needs.

220.    Mr. Portnoy acknowledged that additional testing, such as a cognitive evaluation would have provided useful information for understanding T.M.'s low achievement scores and would have informed appropriate accommodations and services.  (Tr. 458).

221.    Mr. Portnoy reiterated his recommendation for "Tier 2" supports, which according to his testimony could include small group work, a study buddy, additional remedial work, a multi-tiered support system ("MTSS"), and modified assignments.  (Tr. 459-460).

222.    With respect to math, Mr. Portnoy acknowledged that T.M. would "need[] remediation to bring her up," given that she was performing at the third grade level while taking a high school math course.  (Tr. 462).

223.    Ms. Owens, who instructed T.M. from December 2020 through June 2021 for 20 hours per week as part of compensatory education ordered in the June 2019 mediation agreement testified that she quickly found that the information in

T.M.'s IEPs about T.M.'s abilities and academic levels was "very misleading." (Tr. 18-23, 25).

224.     For example, Ms. Owens thought, based on T.M.'s IEP, that she knew how to do division and began working on an algebraic expression that involved division, but realized T.M. did not know how to divide – so she had to "work back" and come up with entirely different, more basic, material to work on. (Tr. 25).

225.     Ms. Owens had to undo and reformulate her whole program due to the discrepancies between what she read in T.M.'s IEP and what she found T.M.'s actual abilities to be while working with her. (Tr. 25).

226.     Ms. Owens further testified that this need to constantly backtrack made T.M. feel unmotivated and caused her to "shut[] down" because T.M. felt that she was being seen or treated "as a baby." (Tr. 25-27).  According to Ms. Owens, things would have started out more smoothly if the District provided her an accurate assessment. (Tr. 27).  In sum, Ms. Owens testified that she would have been able to instruct T.M. more effectively if the District had provided an accurate assessment. (Tr. 25, 27).

227.     The ALJ issued an opinion on January 13, 2023, finding that the District did not deny T.M. a FAPE.

## COUNT I
### Violation of the Individuals with
### Disabilities in Education Act, 20 U.S.C. § 1400, *et seq.*,
### and implementing federal regulations

228.     The ALJ ignored much of the ample evidence in the record
demonstrating the District's denial of a FAPE, reached several erroneous
conclusions of fact and law, and gave undue deference to the District's witnesses.
The ALJ also committed errors of law by not considering several issues properly
submitted for consideration.     Accordingly, Plaintiff seeks review of the
administrative decision as to all issues presented.  Reversal is warranted under the
"modified de novo" standard and based upon a preponderance of the evidence in the
record.

***The District Failed to Evaluate T.M.***

229.     The ALJ first erroneously concluded that the record does not support a
finding that T.M. failed to make academic progress and that consequently, additional
evaluations of T.M. were not needed.  The ALJ specifically held that the fact that
T.M. graduated on time despite her circumstances precluded a finding that she failed
to make academic progress.  Yet, in doing so, the ALJ applied the long-rejected
reasoning that "every handicapped child who is advancing from grade to grade in a
regular public school system in automatically receiving a 'free appropriate public
education.'"  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S.
176, 203, n.25 (1982)).

37

230.     Further, the ALJ ignored the ample evidence in the record evincing T.M.'s lack of progress, including the fact that T.M.'s IEP goals remained largely unchanged—or even decreased in ambition, as was the case with her math goals— year after year (which the ALJ later acknowledged).

231.     The ALJ also ignored evidence in T.M.'s IEPs and academic achievement evaluation results demonstrating that she continued to perform significantly below grade level.  For example, on both the 2019 Brigance evaluation and 2020 Woodcock-Johnson, T.M. performed *seven years-plus* below her grade level in math despite advancing from the ninth to eleventh grade.  To give another example, on both a February 2020 Brigance evaluation and the November 2020 Woodcock-Johnson evaluation, T.M. maintained an approximately seventh-grade level in reading comprehension despite advancing from the tenth to eleventh grade.

232.     The ALJ also ignored the testimony of T.M.'s compensatory education instructor, Ms. Owens, that T.M. did progress in her time with her.

233.     By the time T.M. graduated, she continued to maintain elementary and middle school levels in core subjects of math, reading, and writing.

234.     In short, a review of the record reveals by the preponderance of the evidence that T.M. failed to make meaningful academic progress.

235.     The ALJ next attempted to place the blame on T.M.'s mother, S.C., for not specifically requesting a cognitive evaluation.

236.     This ignored evidence in the record that the District did not provide S.C. with progress reports or otherwise keep S.C. apprised of T.M.'s progress despite S.C.'s repeated requests for more frequent reporting and complaints about the incomplete nature of the reports that she did eventually receive.

237.     Thus, S.C. did not have adequate information to judge what specific further testing would help understand her daughter's educational needs.

238.     That S.C. was interested in a comprehensive test of her daughter is demonstrated by the fact that she requested an independent, comprehensive evaluation both before and after Mr. Portnoy's limited academic achievement testing—which the District denied and then delayed.

239.     Further, the ALJ mischaracterized and ignored relevant portions of Mr. Portnoy's testimony regarding the utility of a cognitive evaluation.

240.     The ALJ paraphrased Mr. Portnoy's testimony as conveying that "cognitive testing may provide evidence of a learning disability, depending on the score," concluding that "[b]eyond Mr. Portnoy's comment, [ ] Petitioner has presented no argument or evidence showing how cognitive testing may have been indicative of a learning disability."

241.     This summation misses the mark.   The District had an ongoing obligation to evaluate T.M. both initially and every three years thereafter not only to

determine her eligibility but also to assess her disability-related needs in the classroom.  34 C.F.R. §§ 300.301, 303.

242.    To that end, Mr. Portnoy more relevantly testified that additional testing, including a cognitive evaluation, would have provided information relevant to understanding T.M.'s low achievement scores and would have informed appropriate accommodations and services.  (Tr. 458).

243.    As noted above, Mr. Portnoy and the District did not seek additional testing because T.M. remained eligible for special education services under the IDEA classification of OHI.  The District demonstrated a complete lack of curiosity to understand T.M.'s individual educational needs despite her low performance, and in doing so violated T.M.'s rights under the regulations and denied her a FAPE.

244.    Similarly, the ALJ erroneously reasoned that because Dr. Garrett's comprehensive evaluation showed that T.M. did not qualify as either cognitively impaired or as a student with a specific learning disability ". . . there is no reason to conclude that a full psychological evaluation of [T.M.] in 2020 would have merited any different approach to her eligibility *or the services provided*."  (emphasis added). This conclusion is both illogical and ignores the more relevant portions of Dr. Garrett's testimony.

245.    Dr. Garrett testified that the District should have performed a cognitive evaluation of T.M. at the outset to gain a baseline with reevaluations every three

years and that the District had further cause to perform such an evaluation after T.M.'s poor results on the 2020 Woodcock-Johnson evaluation.

246.    Like Mr. Portnoy, Dr. Garrett testified that further testing, including a cognitive evaluation, would have provided insights into why her achievement scores were so low.  (Tr. 274-275).

247.    Further, Dr. Garrett testified that based on her own, comprehensive evaluation, the District should have indeed taken a different approach to T.M.'s services, most notably by giving modified assignments and frequent breaks, (273, 279), and having someone "sit[] with her *every class throughout the school day* to ensure that she's understanding [the material]."  (Tr. 278-279) (emphasis added). T.M. needed "maximum[,]" "intensive, individualized support," (269, 270), and the District did not provide that.

248.    T.M.'s resource providers did "push-in" to some extent meaning they attended her classes at times to follow what material was being covered, but from February 2019 to January 2021 the District provided a mere 300 minutes or five hours per week of total special education resource support.  This increased to 600 minutes or ten hours per week in January 2021 (halfway through T.M.'s junior year).

249.    Moreover, resource provider Gretchen Madison testified that there was not enough time in the day for T.M. to take advantage of the resource room.  (Tr. 358-359).  T.M. would have to skip one of her regular general education courses to

41

seek support in the resource room, and thus she did not frequently do this to avoid falling further behind. (*Id.*).

250.    The ALJ also gave undue weight to the opinions of the District's professional staff, reasoning that they spent more time with T.M.

251.    The Sixth Circuit has recognized the flaw in this approach, explaining that "[i]f the law were that a court must defer to the opinions of those who spend the most time with the student and presumably know him best, then there would be no place for experts." *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 794 (6th Cir. 2018). If deference were always given to the student's teachers, "parents could never prevail because the student's teachers will always spend more time with the student or know the student better than the parents' hired experts." *Id.*

252.    Unlike the District, Dr. Garrett performed a comprehensive evaluation of T.M., and she thus had information about T.M.'s abilities that the District never bothered to obtain.

253.    Further, Dr. Garrett's testimony that the District's services were inadequate to meet T.M.'s needs is corroborated by the testimony of T.M.'s compensatory education instructor, Ms. Owens, who immediately realized upon beginning to work with T.M. that her academic levels and abilities were far below how they were portrayed by the District in her IEP. (Tr. 18-23, 25).

254.     The ALJ also failed to consider how a comprehensive evaluation and periodic reevaluations of T.M. would have not only changed the District's approach to the type and degree of services she received but would have also made the services she did receive more effective.

255.     With a better understanding of T.M.'s true abilities, the District could have formulated appropriate goals, her teachers and resource providers could have been more aware of how much of the general education curriculum T.M. was understanding and provided appropriate help, and her compensatory education with Ms. Owens could have been more successful.

256.     These considerations all demonstrate how the District's failure to evaluate T.M. resulted in denial of a FAPE.

257.     Moreover, the ALJ erroneously held that to the extent Plaintiff argued the District violated the IDEA by not conducting an initial cognitive evaluation in 2008, that issue was outside the scope of the proceeding which was limited to actions and omissions after the July 2019 mediation agreement resolving Plaintiff's prior due process complaint.

258.     This is clear legal error.  As the record makes plain, the District *never* conducted a cognitive evaluation of T.M., including after July 2019.

259.    S.C. obtained a cognitive evaluation for her daughter independently in September 2021 only after it became clear to her that the District was not interested in understanding T.M.'s lack of progress and low academic achievement scores.

260.    The District's failure to comprehensively evaluate and reevaluate T.M., as required by the regulations continuously denied her a FAPE.

**The District Failed to Draft Reasonably Calculated IEPs**

261.    The ALJ also made several errors of fact with respect to Plaintiff's claim that the District failed to draft appropriate IEPs.

262.    In the recitation of facts, the ALJ acknowledged that T.M.'s speech and language goals remained "largely unchanged" and that her math goals in fact became *less ambitious* between February 2020 and January 2021. Yet, the ALJ later concluded that the District modified T.M.'s goals "in a manner consistent with [her] progress or lack thereof."

263.    With respect to speech and language, the ALJ correctly recognized at T.M.'s goals remained the same despite her advancement to the next grade level year after year. This is evidence that the initial goals were unattainable based on T.M.'s abilities and the insufficient services provided.

264.    Similarly, the fact that T.M.'s math goals became significantly less ambitious over time indicates that for years, the goals were inappropriately

ambitious, and that the District provided inadequate and inappropriate support in this subject area.

265.     The inappropriateness of T.M.'s goals is corroborated by Ms. Owens' testimony that she began working on algebraic equations with T.M. only to find that she did not know how to divide.  (Tr. 25).

266.     The inappropriateness of T.M.'s goals is also corroborated by Dr. Garrett's testimony, (Tr. 279-281, 283-285), which the ALJ did not consider.

267.     The ALJ makes several errors of fact with respect to the District's inclusion of a writing goal in T.M.'s IEP.

268.     The ALJ simply states that the District added a writing goal to T.M.'s 2020 IEP at S.C.'s request.  This omits the fact that the District first inexplicably removed the writing goal from T.M.'s February 11, 2020, IEP despite S.C.'s express request that one be included.  The District told S.C. it could not add more than two subjects with two goals each.

269.     The ALJ agreed that there is no such cap of four goals but did not address why then the District gave S.C. this blatantly erroneous response to her request for an additional goal.

270.     That the District finally added a writing goal back in almost a full year later is a prime example of the District's lack of responsiveness to S.C.'s concerns

as well as the District's repeated formulation of T.M.'s IEPs without a grounding in data about her abilities and educational needs.

271.    In addition, the ALJ made an error of law by failing to consider whether the District's denial of S.C. a meaningful participatory role in formulating T.M.'s IEPs amounted to denial of a FAPE, including the District's failure to provide S.C. with data they relied on to draft T.M.'s IEPs.

272.    As set forth in 20 U.S.C. § 1415(b)(7)(A)(iii), a due process complaint need only include "a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem."  This is a low pleading standard that requires providing enough specificity "to allow the responding party to understand what the Petitioner believes the Respondent has done or failed to do . . . and how that action or inaction has harmed or interfered with Petitioner's education."  *F.C. v. Tenn. Dep't of Educ.*, No. 3:16-cv-613 (M.D. Tenn Mar. 6, 2017).

273.    As a 2003 Senate Committee Report elaborates, the pleading standard for a due process complaint need not "reach the level of specificity and detail of a pleading or complaint filed in a court of law" with its purpose being to "ensure that the other party . . . will have an awareness and understanding of the issues forming the basis of the complaint."    S. Rep. No. 108-185, at 34 (2003),

https://www.congress.gov/108/crpt/srpt/CRPT-108srpt185.pdf (accessed Mar. 12, 2023).

274.    T.M.'s due process complaint contained numerous allegations related to the District's refusal to allow S.C. to meaningfully participate, including the District's failure to provide information it relied on to develop T.M.'s IEPs.  (*See, e.g.*, Due Process Complaint at ¶¶ 16, 55, 58, 63, 82).  This issue was also addressed at length during the administrative hearing.  (*See, e.g.*, Tr. 86, 145-146, 159, 166).

275.    The April 30, 2021 Order identifying the issues to be covered at the administrative hearing included whether the District denied T.M. a FAPE by "[f]ailing to draft an IEP reasonably calculated to meet T.M.'s educational needs and allow her to access an educational benefit and make appropriate progress."  Plaintiff's allegation that T.M.'s IEPs were not reasonably calculated to meet her educational needs because of the District's failure to meaningfully inform and involve S.C. in the process fits squarely within this identified issue.

276.    This issue was properly presented for review, yet not addressed by the ALJ, and should therefore be considered de novo.  *See Metro. Nashville Davidson Cty. Sch. v. Guest*, 900 F. Supp. 905, 907 (M.D. Tenn. 1995) (addressing issue not decided by ALJ de novo).

277.      The ALJ's finding that the District *did* adequately involve S.C. and respond to her concerns is not supported by the preponderance of the evidence in the record.

278.      Most notably, the ALJ ignored S.C.'s testimony that the District never provided her progress reports, (Tr. 166), and that T.M.'s resource providers did not meaningfully fill out T.M.'s progress reports in a way that would have allowed S.C. to assess her progress or needs. (Tr. 378-379, 492).  Nor did the ALJ consider that the District denied S.C.'s persistent requests to increase the frequency of the reporting requirement in T.M.'s IEPs.  The ALJ did not consider that the District ignored S.C.'s requests—at the February 2019, February 2020, and October 2020 IEP meetings—for additional evaluations of T.M., and that the District provided the 2020 Woodcock-Johnson evaluation only after denying S.C.'s request for an independent evaluation to avoid a further due process complaint. (Tr. 46).  The District then impeded and delayed S.C.'s efforts to obtain an independent evaluation after finally approving her request.  Finally, as discussed above, the ALJ omitted the fact that the District baselessly denied S.C.'s request for the addition of a writing goal in T.M.'s February 11, 2020, IEP.  The District prevented S.C. from gaining information that would have allowed her to understand her daughter's needs, and thus would have allowed her to meaningfully participate.

279.    The ALJ's factual conclusions to the contrary were unsupported and ignored critical evidence in the record.

**_The District Failed to Revise T.M.'s IEPs_**

280.    With respect to the District's failure to revise T.M.'s IEPs in light of T.M.'s lack of progress, the ALJ held that he could not rely on Ms. Owens' progress notes indicating T.M.'s true, lower abilities and lack of progress, as they were not submitted in the record, even though Ms. Owens testified at the hearing that she found T.M.'s abilities in math, reading, and writing to be lower than represented on her IEP, that T.M. failed to make progress while working with her, and that she sent weekly progress reports to the District reflecting as much. (Tr. 18-23, 25-27). In any case, T.M. plans to seek leave to expand the record to include Ms. Owens' progress notes.

281.    Moreover, as detailed above, the ALJ did not consider other evidence in the record evincing T.M.'s lack of progress, including the fact that T.M.'s IEP goals remained largely unchanged—or decreased in ambition—year after year while the type and degree of services remained the same. For example, T.M.'s February 2019 math goal indicated she would aim to solve multi-step problems, while her February 2020 math goal included the much more basic skills of subtraction and division. Yet, the District did not add any accommodations or services to

specifically address T.M.'s elementary-school math abilities, such as modified assignments or direct services.

282.     The District's failure to meaningfully revise T.M.'s IEP became even more egregious following Mr. Portnoy's 2020 Woodcock-Johnson evaluation.  On this score, the ALJ simply concluded that "most if not all of [Mr. Portnoy's recommendations] were . . . incorporated into [T.M.'s] IEPs."

283.     This conclusion is not supported by the record.

284.     For math, Mr. Portnoy's Report specifically recommended that the District provide support from a special education resource teacher and noted that modification of assignments may be needed.   At the hearing, Mr. Portnoy emphasized that T.M. would "need[] remediation [in math] to bring her up," (Tr. 462), as she was performing at the third grade level while taking a high school math course.  Yet, in T.M.'s December 2020 IEP, the District did not provide any new accommodations or services to specifically address T.M.'s poor math performance, such as modified assignments or direct services.  Further, Mr. Portnoy's report simply identified "Tier 2" as the appropriate level of support for T.M. and provided examples, generally, of what that may entail.  The report expressly stated that the list provided was not exhaustive.  Mr. Portnoy clarified at the hearing that his report merely provided examples of what Tier 2 supports could include, noting that Tier 2

support entails "all sorts of possibilities" and could include remedial work.  (Tr. 439).

285.    Beyond the District's failure to revise T.M.'s IEP to provide adequate support in math after the Woodcock-Johnson evaluation, the District also failed to revise her IEP with respect to her other identified areas of need.  For example, although the November 2020 Woodcock-Johnson evaluation demonstrated that, in eleventh grade, T.M. continued to have roughly a seventh-grade reading comprehension level and a fifth-grade reading fluency level, the District removed reading as an area of need from T.M.'s December 2020 IEP.  The District added a reading goal back in in January 2021, this time inexplicably focusing only on reading fluency rather than reading comprehension.

286.    In December 2020 and January 2021, the District continued to provide only 1.5 hours per month of direct services for speech and language.

287.    Further, the ALJ did not consider the District's failure to revise T.M.'s IEPs in light of S.C.'s persistent concerns about the adequacy of T.M.'s educational services.  As discussed above, one example of this is the District's refusal to add a writing goal into T.M.'s February 11, 2020, IEP despite S.C.'s request.

288.    As detailed above, S.C. repeatedly expressed concern that her daughter was not receiving adequate services, but those concerns were largely ignored.

*The District Failed to Implement T.M.'s IEPs*

289.     Finally, the ALJ did not fully address T.M.'s claim that the District failed to implement her IEPs.

290.     Plaintiff asserted that Ms. Owens, who provided compensatory education to assist T.M. in meeting her IEP goals, was unable to effectively implement T.M.'s IEP because the plan, as written, did not accurately reflect T.M.'s abilities in reading or math.  In addition, the District did not allow T.M.'s compensatory education to occur on the weekend, requiring the four-hour-long instructional sessions to occur after a full school day despite of the District's awareness of T.M.'s struggles with concentration and fatigue.  In short, Plaintiff asserted that the District prevented Ms. Owens from implementing T.M.'s IEP.

291.     T.M.'s classroom teachers provided testimony about not having enough hours in a day and one even testified to not even knowing that she had an IEP. These teachers were responsible for implementing the IEP services and accommodations themselves.

292.     The ALJ mistakenly interpreted Plaintiff's claim to be that Ms. Owens' testimony concerning T.M.'s low academic abilities demonstrated that the District had not been properly implementing her IEPs.

293.     Accordingly, Plaintiff's failure to implement claim, as clarified above, should be addressed de novo.  *See Metro. Nashville Davidson Cty. Sch.*, 900 F. Supp. at 907.

294.     In any case, the ALJ erroneously concluded that, "Petitioner has not shown by a preponderance of the evidence that Darya Owens's estimation of [T.M.'s] abilities . . . were a more reliable and accurate indicator than [T.M.'s] performance on the academic achievement evaluation administered by Mr. Portnoy."

295.     Mr. Portnoy's evaluation of T.M., unlike Dr. Garrett's later evaluation, did not provide a complete picture of T.M. abilities, as it did not include a cognitive evaluation.   Dr. Garrett's comprehensive evaluation corroborated Ms. Owen's observations about T.M.'s low academic abilities.

296.     Thus, the ALJ both failed to account for Dr. Garrett's testimony and to explain why he found Mr. Portnoy's testimony more reliable despite Mr. Portnoy's more limited evaluation.

***The ALJ erroneously failed to consider Plaintiff's failure to train and transportation-related allegations***

297.     The ALJ committed an error of law by failing to address three additional issues that were properly presented for decision.

298.     The first issue relates to the District's failure to properly train its professional staff.  The factual "failure to train" allegations contained in Plaintiff's

closing brief, which were also covered at length at the due process hearing, (*see, e.g.,* Tr. 378-379, 492), relate to T.M.'s resource providers' failure to properly fill out progress reports and service logs, which would have allowed S.C. to be informed of her daughter's progress or lack thereof.  This would have in turn allowed S.C. to meaningfully participate in the drafting of T.M.'s IEPs.  It would also have informed other members of T.M.'s IEP team of the need for further evaluations of T.M., the need to revise her IEP goals to correspond with her abilities, and the need to revise the type and degree of services provided to enable T.M. to make appropriate progress.  Accordingly, these facts relate to several identified issues for review— failure to evaluate, draft, and revise T.M.'s IEPs.

299.    As discussed above, the pleading standard for due process complaints is lower than that of complaints filed in federal court and need only put the respondent on notice of the nature of the alleged violation and how that impacted the child's education.  Plaintiff's due process complaint contained several allegations related to the District's failure to properly track and inform S.C. of T.M.'s progress, including the incomplete nature of service logs provided to S.C.  (*See, e.g.*, Due Process Complaint at ¶¶ 21, 78).  Thus, Defendant was on notice of this issue.

300.    The second issue the ALJ erroneously deemed outside the scope of review is the District's failure to adequately provide T.M. transportation to and from school.  Again, this issue was sufficiently raised in Plaintiff's due process complaint

which contained allegations related to initial issues T.M. experienced with transportation which then continued through her senior year. (*See, e.g.*, Due Process Complaint at ¶ 21). The complaint also contained allegations related generally to S.C.'s concerns that T.M.'s IEPs were not being properly implemented. (*See id.* at ¶¶ 78, 83). The issue of transportation was also covered at the due process hearing. (Tr. 101-103, 138). In fact, the ALJ overruled defense counsel's objection that testimony concerning the District's failure to provide transportation was outside the agreed-upon scope of the hearing, accepting Plaintiff counsel's explanation that the topic relates to the District's failure to implementation of T.M.'s IEPs—an identified issue for decision. (Tr. 99-100).

301.    The third issue the ALJ erroneously deemed out of the scope of review was S.C.'s transition plan. Transition plans are a required part of IEPs and proper to consider as to whether the IEP was appropriate. The ALJ likewise overruled defense counsel's objection that the transition plan was outside the agreed-upon scope of the hearing. (*Id.*)

302.    For the foregoing reasons, the District failed to provide a free appropriate public education to Plaintiff.

303.    As a direct and proximate cause of MDE's violations of the IDEA, Plaintiff has suffered substantial harm to, among other things, her educational

experience and opportunity, academic and intellectual progress, and future earning capacity.

**COUNT II**
**Discrimination based on disability**
**in violation of Section 504 of the**
**Rehabilitation Act, 29 U.S.C. § 794 *et seq.***

304.    Plaintiff re-alleges all prior paragraphs as though fully set forth herein.

305.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, in pertinent part, that "[n]o otherwise qualified individual with a  disability . . . shall, solely by reason of his or her disability, be excluded from the  participation in, be denied the benefits of, or be subjected to discrimination under any  program or activity receiving Federal financial assistance." 20 U.S.C. § 794(a); see also 34 C.F.R. § 104.4(a).

306.    A person is an "individual with a disability" under Section 504 if that person experiences  "a physical or mental impairment which substantially limits one or more major life activities."  29 U.S.C. § 705(20)(B) (incorporating definition in 42 U.S.C. § 12102 by reference).

307.    "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

308.     In the context of public K-12 education, a "qualified individual with a disability" under Section 504 includes an individual with a disability of an age during which persons who do not experience disabilities are provided K-12 public education.  34 C.F.R. § 104.3(1)(2).

309.     A "program or activity" includes public K-12 school districts and a "department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b) (referencing 20 U.S.C. § 7801(30)).

310.     Pursuant to 29 U.S.C. § 794(a), the predecessor to the U.S. Department of Education promulgated regulations regarding application of Section 504's antidiscrimination mandate to K-12 schools that receive federal funding.  The obligations under these regulations are in addition to the general antidiscrimination requirements of 29 U.S.C. § 794.

311.     Under these regulations school districts must, *inter alia*:

   a.  provide a free appropriate public education to each qualified (individual with  a disability] who is in the recipient's jurisdiction, regardless of the nature or severity of the person's [disability]," 34 C.F.R. § 104.33(a);

   b.  "educate, or ... provide for the education of, each qualified [individual with a disability] in its jurisdiction with persons who [do not experience disabilities] to the maximum extent appropriate to the needs of the [individual with a  disability]." 34 C.F.R. § 104.34(a);

c. "place [an individual with a disability] in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily. Whenever a recipient places a person in a setting other than the regular educational environment pursuant to this paragraph, it shall take into account the proximity of the alternate setting to the person's home." 34 C.F.R. § 104.34(a);

d. "ensure that [individuals with disabilities] participate with non [disabled] persons in [nonacademic and extracurricular services and activities, including meals, recess periods, and other nonacademic services] to the maximum extent appropriate to the needs of the [individual with a disability] in question." 34 C.F.R. § 104.34(b). These nonacademic services include, but are not limited to: counseling services, athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the recipients, and others. 34 C.F.R. § 104.37(a)(2);

e. conduct evaluations in accordance with 34 C.F.R. § 104.35(b) "before taking any action with respect to the initial placement of the person

[with a  disability] in regular or special education and any subsequent significant change in placement." 34 C.F.R. § 104.35(a);

f.  provide procedural safeguards, including, inter alia, notice, an opportunity to  examine records, an impartial hearing, and a hearing review process. 34 C.F.R. § 104.36.

312.     Under Section 504, FAPE requires the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of [a  child with a disability] as adequately as the needs of [non-disabled students] are met and  (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R.] §  104.34, 104.35, and 104.36."

313.     Section 504's K-12 education regulations apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to  recipients that operate, or that receive Federal financial assistance for the operation of,  such programs or activities." 34 C.F.R. § 104.31.

314.     The District is a "program or activity" under Section 504 and a recipient of federal financial assistance for the provision of elementary and secondary education and are therefore obligated to comply with Section 504 and the regulations under 34 C.F.R. Part 104.

315.     At all times pertinent to this Complaint, T.M. was eligible for enrollment at the District, and eligible for the receipt of public K-12 education from the District, including a FAPE under Section 504.

316.     Through the acts and omissions set forth herein, the District, acting under color of law, discriminated against T.M. based on disability and in violation of Section 504,  including, but not limited to, the following:

   a. The District denied T.M. the opportunity to participate in the benefits of public education equal to that provided to persons who do not experience disabilities, including having access to educational instruction in an amount equal to that of her same-age, non-disabled peers.

   b. The District failed to provide T.M. an opportunity to participate in or benefit from the public education equal to that provided to persons who do not experience disabilities.

   c. To the extent the District provided any public educational services to T.M. during the time pertinent to this Complaint, such services were not appropriate or reasonably calculated to provide T.M. an opportunity to participate in or benefit from the public education equal to that provided to persons who do not experience disabilities.

d.      The District failed to educate T.M., or provide for T.M.'s education, equal to that provided for persons who do not experience disabilities to the maximum extent appropriate to T.M.'s needs.

317.    The District denied T.M. a FAPE in violation of Section 504 regulations, based upon the foregoing allegations and such other violations of Section 504 as may be discovered during the course of this matter.  All such claims are hereby reserved.

318.    The District's violations of Section 504 have caused, and continue to cause, actual and proximate harm to T.M.

319.    At the time the District violated T.M.'s rights under Section 504 as set forth above, the District, and its respective agents, had knowledge that a harm to a federally protected right was substantially likely, and were deliberately indifferent to that risk.

320.    The District, and its respective agents, acted with reckless or callous indifference to T.M.'s federally protected rights under Section 504.

321.    These repeated violations constitute a continuing violation of Section 504 of the Rehabilitation Act.

322.    As a direct and proximate cause of the District's violation of Section 504, Plaintiff has suffered substantial harm to, among other things, her educational

experience and opportunity, academic and intellectual progress, and future earning capacity.

## COUNT III
### Discrimination based on disability in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

323.    Plaintiff re-alleges all prior paragraphs as though fully set forth herein.

324.    42 U.S.C. § 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

325.    The District is a public entity subject to Title II.

326.    Plaintiff is a person with a disability within the meaning of the ADA. 42 U.S.C. § 12102.

327.    The District intentionally violated Plaintiff's rights under the ADA and its regulations by denying her access to equal educational opportunities afforded to students with disabilities; by excluding her from participation in and denying them the benefits of the District's and State's services, programs, and activities; and by subjecting her to discrimination. 42 U.S.C. § 12132.

328.    The District otherwise intentionally discriminated against Plaintiff in violation of 42 U.S.C. § 12132.

329.    Disability discrimination under Title II also includes a public entity's failure to make reasonable modifications necessary to avoid disability discrimination.  28 C.F.R. § 35.130(b)(7).

330.    ADA regulations specify, inter alia, that it is unlawful discrimination for a public entity either directly or through contractual, licensing, or other arrangements to:

> a.  "Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;"
>
> b.  "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;"
>
> c.  "[p]rovide a qualified individual with a disability with an aid, benefit, or  service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others,"
>
> d.  "Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or  person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;"

e. "Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1).

331.    Under the ADA regulations, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (1) That  have the effect of subjecting qualified individuals with disabilities to discrimination on  the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program  with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3).

332.    ADA regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  Pursuant to statutory authority, the U.S. Attorney General defined the "most integrated setting" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Nondiscrimination on the Basis of Disability in State and Local Government Services*, 56 Fed. Reg. 35696, 35705 (July 26, 1991) (incorporated at 28 C.F.R. pt. 35, App. B); *see also* 5 U.S.C. § 301.

333.      "Individual with disability" and "major life activities" have the same meaning under Title II of the ADA and under Section 504 as set forth above.  20 U.S.C. § 12102.

334.      Under Title II of the ADA, a public entity includes any state or local government and any "department, agency, special purpose district, or other instrumentality of a State or States or local government."  28 C.F.R. § 35.104.

335.      "Qualified individual with a disability" under ADA Title II means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  28 C.F.R. § 35.104.

336.      Through the acts and omissions described herein, The District acting under color of law, is discriminating against T.M. in violation of the ADA, including, but not limited to  the following ways:

a.  Denying T.M. the opportunity to participate in or benefit from educational services equal to that afforded to others;

b.  Denying T.M. educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

c.  Denying T.M. the opportunity to receive educational programs and services in the most integrated setting appropriate to her needs;

d.  Failing to make reasonable modifications to its programs and services necessary to avoid discrimination against T.M.;

e.  Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of the District's educational programs with respect to T.M.

337.  At the time the District violated T.M.'s rights under the ADA as set forth above, the District, and its respective agents, had knowledge that a harm to a federally protected  right was substantially likely, and were deliberately indifferent to that risk.

338.  The District, and its respective agents, acted with reckless or callous indifference to  T.M.'s federally protected rights under the ADA.

339.  As a direct and proximate cause of the District's violation of the ADA, Plaintiff has suffered substantial harm to, among other things, her educational experience and opportunity, academic and intellectual progress, and future earning capacity.

## COUNT IV
### Discrimination based on disability
### in violation of Michigan's
### Persons with Disabilities Civil Rights Act
### M.C.L. 37.1101 *et seq.*

340.     Plaintiff re-alleges all prior paragraphs as though fully set forth herein.

341.     The District is an education institution as defined in the Persons with Disabilities Civil Rights Act ("PDCRA"). M.C.L. 37.1401 *et seq.*

342.     Plaintiff is a person with a disability within the meaning of PDCRA. *Id.*

343.     PDCRA prohibits discrimination in educational institutions or facilities because of a disability. M.C.L. 37.1302; M.C.L. 37.1402.

344.     PDCRA prohibits educational institutions from discriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of a disability. M.C.L. 37.1402(a).

345.     PDCRA prohibits places of public accommodation, including educational facilities, from denying an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations because of a disability. M.C.L. 37.1302(a).

346.     The District's failure to accommodate T.M. and failure to provide T.M. with a full and equal enjoyment of its services constitute discrimination under PDCRA.

347.     The District denied T.M. access to a public education on the basis of her disability in violation of PDCRA.

348.     As a direct and proximate cause of the District's violation of PDCRA, Plaintiff has suffered substantial harm to, among other things, her educational experience and opportunity, academic and intellectual progress, and future earning capacity.

## DAMAGES

349.     Plaintiff re-alleges all prior paragraphs as though fully set forth herein.

350.     As a direct and proximate result of the above-described conduct, Plaintiff suffered general, specific, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

    a.  Pain, suffering, and mental and emotional distress;

    b.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliation;

    c.  Loss of her constitutional rights;

    d.  Loss of education;

    e.  Loss of employment;

    f.  Economic loss;

    g.  Loss of the ordinary pleasures of everyday life;

    h.  Loss of relationships; and

    i.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment against Defendant as follows:

A.  Issue a Declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the District violated the IDEA by knowingly failing to provide T.M. with a FAPE from July 2019 to April 2021;

B.  Vacate the January 13, 2023, Decision and Order of the ALJ;

C.  Award T.M. compensatory education in the form of two years of one-on-one instruction in reading, writing, and mathematics of eight hours a week each, amounting to 832 hours at $100.00 per hour, or $83,200.00;

D.  Award T.M. two years of weekly behavioral and mental health sessions lasting an hour each, amounting to 104 hours at $150.00 per hour, or $15,600.00;

E.  For past, present, and future non-economic damages in an amount to be determined at trial;

F.  For past, present, and future general, specific, incidental, and consequential damages in an amount to be determined at trial;

G.  For any appropriate statutory damages;

H.  For costs of this suit;

I.  For punitive damages, according to proof, as appropriate to the individual cause of action;

J.  For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

K.  For reasonable attorney fees, costs, and interest, to the fullest extent allowed by law; and

L.  Order any other and further relief, both legal and equitable, that this Court may deem just and proper.

## **JURY DEMAND**

Now comes Plaintiff, by and through her attorneys, and demands a trial by jury.

Dated:        April 13, 2023              Respectfully Submitted,

**s/ Elizabeth K. Abdnour**
Elizabeth K. Abdnour P78203
Jacquelyn N. Babinski P83575
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 709-7700
elizabeth@abdnour.com
jacquelyn.babinski@abdnour.com

*Attorneys for Plaintiff*